IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 14, 2015 Session

IN RE ALLEYANNA C.

Appeal from the Juvenile Court for Hamilton County
No. 260,449     Robert D. Philyaw, Judge

No. E2014-02343-COA-R3-PT-FILED-AUGUST 10, 2015

This is a termination of parental rights case, focusing on Allyanna C., the minor child ("the Child") of Allen C. ("Father") and Annaliza H. ("Mother"). The Child was taken into protective custody by the Tennessee Department of Children's Services ("DCS") on July 27, 2011, upon its investigation of environmental dangers in Mother's home and subsequent determination that placement with Father was unsuitable. On April 16, 2014, DCS filed a petition to terminate the parental rights of both parents. Following a bench trial, the trial court found that statutory grounds existed to terminate the parental rights of both parents upon its finding by clear and convincing evidence that (1) the parents abandoned the Child by failing to provide a suitable home, (2) the parents failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans, and (3) the conditions leading to the Child's removal from the home persisted. The court also found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Child's best interest. Father and Mother have each appealed. Because the statutory ground of abandonment through failure to provide a suitable home was not pled by DCS in the petition or defended on appeal, we reverse the trial court's finding on that ground as to both parents. We affirm the trial court's judgment in all other respects, including the termination of Mother's and Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

David C. Veazey, Chattanooga, Tennessee, for the appellant, Allen C.

Charlotte Kimsey, Chattanooga, Tennessee, for the appellant, Annaliza H.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

The Child is Father's only child. Father's name appears on the Child's birth certificate, and he has acknowledged paternity since the Child's birth in March 2011. The Child is the youngest of six children born to Mother. The oldest three children previously had been removed from Mother's custody. The parents, who were never married, had lived together in the paternal grandmother's home in the first weeks after the Child's birth. When the Child was approximately one month old, Mother moved out of the home with the Child and the two other children still in her custody at that time. During the next two to three months, Father and Mother co-parented by having the Child reside alternating weeks with each parent. Father testified that during this time period, he was concerned because Mother was living in a residence that had mold and mildew throughout the bathroom.

DCS personnel, already involved with Mother because of her older children, investigated Mother's living situation during the months following the Child's birth. In July 2011, a DCS investigator located Mother with the Child and found environmental dangers in Mother's home, including unsanitary conditions, the presence of cockroaches, and safety hazards. On July 27, 2011, DCS obtained an Order of Temporary Legal Custody from the trial court and removed the Child and the other two children living with Mother into protective custody. In addition to allegations of environmental dangers, DCS alleged that Mother had been changing residences frequently by staying with various family members and friends.

DCS family service worker Kelly Dyer testified that at the time of the Child's removal, no relative placement was available for the Child. Each of the Child's half-siblings was placed in the temporary custody of a relative. DCS placed the Child in a non-relative foster home. After one transfer to a second foster home soon after entering protective custody, she remained in that home for nearly three years until the time of the termination proceedings. Mother still maintained her parental rights to all six children at the time of trial, but none of the children had been returned to her custody. The Child's foster mother testified during trial that the Child was bonded to her family and that she and her husband thought of the Child as their daughter. It is undisputed that the Child has

2

thrived in the foster parents' care. The foster mother confirmed that she and her husband wish to adopt the Child.

DCS filed a petition for temporary custody of the Child on August 12, 2011, alleging that the Child was dependent and neglected as to both parents. In this petition, DCS averred that in part the Child could not be placed with Father because he had "acknowledged in court that he last used marijuana during the first week of June 2011." Father has not disputed this averment. Mother and Father respectively waived their rights to a preliminary hearing, and the trial court found probable cause that the Child was dependent and neglected in an order entered September 6, 2011. The trial court subsequently adjudicated the Child dependent and neglected on April 16, 2012, after the parents waived their respective rights to an adjudicatory hearing. In its April 2012 order, the trial court found that Mother had a "history of unstable and unsuitable housing," stating specifically that Mother had been "residing with various family members and friends" and had been living in residences considered unsuitable by DCS due to "roaches, unsanitary conditions, and safety hazards." The court noted that both parents had indicated in a signed petition for a consent order that they were willing to transfer custody of the Child to a relative because they were "too unstable to care for their child."

Prior to filing the petition for termination of parental rights, DCS developed four permanency plans for the Child and both parents. All four plans were presented as exhibits during the termination proceedings. The first permanency plan was established on August 18, 2011, and ratified by the trial court on November 9, 2011. Both parents were involved in the development of the plan and indicated by their respective signatures their agreement with it. Under that initial permanency plan, the parents' relevant responsibilities and requirements were that they participate in supervised visitation with the Child; communicate with the Child; each separately provide a home free from environmental hazards, safety hazards, and unsanitary conditions; each separately provide a home free from domestic violence, drugs, and unlawful activities or individuals; participate in random drug screens, complete an alcohol and drug assessment upon any failed screen, and follow all resultant recommendations; participate in domestic violence classes/counseling and follow attendant recommendations made by treatment professionals; provide proof of legal, verifiable income for a period of no less than six consecutive months; pay child support as ordered by the court; notify DCS of any changed circumstances; maintain contact with DCS; and attend child and family team meetings and court hearings. Ms. Dyer testified that the requirement regarding domestic violence education was initially included because each parent previously had been arrested on a domestic violence charge. Father was also required to refrain from illegal activities or association with people who participated in illegal activities.

3

At some point near the end of 2011, a domestic violence incident occurred during Father's and Mother's joint supervised visitation with the Child at a McDonald's restaurant. A visitation supervisor was present in the course of the event but did not testify during the instant proceedings. The Child was present throughout the incident. According to Mother's testimony, Father threw coffee on Mother. Conversely, Father testified that he inadvertently knocked over the coffee in an attempt to grab a cellular telephone from Mother that he believed to be his. Father acknowledged that he later pled guilty to a criminal charge of reckless endangerment stemming from the incident. In addition, Father's visitation privileges with the Child were suspended in December 2011, and he was not permitted contact with Mother or the Child pending completion of domestic violence education.[1]

The second permanency plan was established on March 26, 2012, and ratified by the trial court on June 27, 2012. Although the parents were again involved in the development of the plan, they each indicated, respectively, that they disagreed with it. Requirements and responsibilities under this second plan remained essentially as under the first plan, notwithstanding Father's visitation privileges with the Child having been suspended due to the December 2011 incident.

Contrary to Ms. Dyer's testimony, our line-by-line review of the first permanency plan reveals that it does not include a requirement for either parent to attend parenting classes. The requirement to attend domestic violence classes does include an action step for the parents of "address[ing] the negative impact of domestic violence on [the Child]." Parenting classes specifically are mentioned in the second plan within an introductory section addressing the conditions still existing that prevented the Child from leaving state custody. Within this section, DCS reported that neither parent had completed "parenting classes or domestic violence classes."

It is undisputed that at some point soon after development of the second permanency plan in March 2012, Father disappeared and made no contact with DCS for nearly eighteen months, resurfacing in August 2013. In the meantime, the trial court found in an Order on Permanency Hearing entered on August 2, 2012, that Father had been arrested in March 2012 and charged with theft under $500, vandalism/malicious mischief, and assault. Father testified at trial that he was incarcerated for approximately three months during this time period as a result of the reckless endangerment conviction. During the remainder of his eighteen-month absence, Father claimed to have been residing with his father in Georgia. He acknowledged that he remained in Georgia to

---

[1] According to Father's testimony, a no-contact order was entered by the Hamilton County General Sessions court when he pled guilty to reckless endangerment. Ms. Dyer also testified that Father was under a no-contact order following the incident giving rise to the conviction. This order is not in the record on appeal.

avoid service of pending warrants. Father further admitted that he made no contact with DCS during his long absence. Ms. Dyer testified that upon information related by one of Mother's older children, DCS personnel suspected that during this eighteen-month period, Father had been in contact with Mother and present during at least one of Mother's unsupervised visits with the Child despite the no-contact order and suspension of his visitation privileges.

The third permanency plan was established on July 10, 2013, and ratified by the trial court on September 4, 2013. Father had not yet resumed contact with DCS at the time this plan was developed, but he was represented during its development by his former counsel. Mother, in fact, was present during development of the plan but again indicated that she disagreed with it. This third plan included a specific requirement for Father to complete remaining parenting class sessions that he needed in order to receive his certificate of completion for a parenting class. The balance of relevant responsibilities and requirements for the parents remained the same as in the previous two plans.

The fourth permanency plan was established on February 25, 2014, and ratified by the trial court on May 14, 2014. Father was present for the development of this plan, and he indicated by his signature agreement with its terms. Mother, also present, refused to sign any documents during the development of this plan. The parents' responsibilities and requirements remained essentially unchanged under this final plan.

On April 16, 2014, DCS filed a petition to terminate the parental rights of Father and Mother, alleging, as to both parents, statutory grounds of substantial noncompliance with the permanency plans and persistence of the conditions leading to removal of the Child. The trial court subsequently appointed counsel to represent each parent and attorney Rachel Wright as guardian *ad litem*.

Following a bench trial conducted over two nonconsecutive days on August 29, 2014, and October 13, 2014, the trial court determined that grounds existed to terminate the parental rights of both parents. The court found by clear and convincing evidence that both parents had abandoned the Child by failing to provide a suitable home and had failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans. In addition, the court found as to both parents clear and convincing evidence of the statutory ground of persistence of the conditions leading to the Child's removal from the home. The court further found by clear and convincing evidence that termination of Father's and Mother's parental rights was in the best interest of the Child. The court entered an order to this effect on November 4, 2014, and set a date for review of the final order. The final judgment terminating parental rights was subsequently entered on November 19, 2014. Each parent separately filed a timely appeal.

## II.  Issues Presented

On appeal, Father presents four issues, which we have restated as follows:

1.   Whether the trial court erred by finding clear and convincing evidence of the statutory ground of abandonment by Father's failure to provide a suitable home.

2.   Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Father's failure to substantially comply with the responsibilities and requirements of the permanency plans.

3.   Whether the trial court erred by finding clear and convincing evidence of the statutory ground of persistence of the conditions leading to the Child's removal from Father's home.

4.   Whether the trial court erred by finding clear and convincing evidence that it was in the best interest of the Child to terminate Father's parental rights.

Mother presents three issues, which we have similarly restated as follows:

5.   Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Mother's failure to substantially comply with the responsibilities and requirements of the permanency plans.

6.   Whether the trial court erred by finding clear and convincing evidence of the statutory ground of persistence of the conditions leading to the Child's removal from Mother's home.

7.   Whether the trial court erred by finding clear and convincing evidence that it was in the best interest of the Child to terminate Mother's parental rights.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record,

accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Abandonment by Failure to Provide a Suitable Home

The trial court found by clear and convincing evidence that Father and Mother had abandoned the Child by failing to provide a suitable home. DCS concedes that it did not plead this statutory ground as to either parent in its termination petition and states on appeal that it is not defending this ground. *See, e.g., In re Landon H.*, No. M2011-00737-

7

COA-R3-PT, 2012 WL 113659 at *6-7 (Tenn. Ct. App. Jan. 11, 2012) (vacating the trial court's termination of parental rights on a ground not pled in the complaint or tried by implied consent). Father raises the issue of this statutory ground on appeal, arguing that DCS failed to make reasonable efforts to assist him in establishing a suitable home in the four months following the Child's removal. Mother does not raise this statutory ground as an issue. However, due to the fundamental constitutional interest involved, we address this issue as to Mother also. *See In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010) (analyzing the trial court's findings regarding statutory grounds despite the father's having raised only auxiliary issues); *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015).

Tennessee Code Annotated § 36-1-113(g)(1) (2014) provides in relevant part:

(g)      Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

      (1)      Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(ii) provides:

(ii)      The child has been removed from the home of [a] parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist [a] parent or parents or a guardian or guardians to establish a suitable home for the child, but that [a] parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an

early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . .

As this Court has explained, "'A ground for termination not included in the petition can be properly found if the ground was tried by implied consent.'" *In re Alysia S.*, 460 S.W.3d 536, 564 (Tenn. Ct. App. 2014) (quoting *In re Johnny K.F.*, No. E2012-02700-COA-R3-PT, 2013 WL 4679269 at *8 (Tenn. Ct. App. Aug. 27, 2013)). DCS has elected, however, not to defend this statutory ground and has not presented an argument that the ground was tried by implied consent. *See id.* ("'The strict application of procedural requirements in cases involving the termination of parental rights requires that before there can be a finding that a ground not alleged in the petition was tried by implied consent, the record must be clear that such ground was indeed tried by implied consent.'"). We therefore reverse, as to Father and Mother, the trial court's finding regarding the statutory ground of abandonment through failure to provide a suitable home. Father's argument regarding reasonable efforts in the context of this statutory ground is pretermitted as moot.

## V. Substantial Noncompliance with Permanency Plans

The trial court also found clear and convincing evidence that Father and Mother failed to substantially comply with the reasonable responsibilities set out in their permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

In its final judgment, the trial court stated specific findings of fact regarding this statutory ground as follows:

Respondents, [Mother and Father], have failed to comply in a substantial manner with the statement of responsibilities set out in periodic foster care plans prepared for and signed by said Respondents, following the subject child being found to be dependent and neglected by the Juvenile Court of Hamilton County. Children's Services has explained to Respondents those reasonable responsibilities, which are directly related and aimed at remedying the conditions, which necessitate foster care

9

placement. Specifically, Respondents . . . have failed to provide a safe, stable, permanent residen[ce] for the subject child, provide proof of legal, verifiable income, complete domestic violence education and following through on recommendations, refrain from illegal activities, maintain consistent visitation and/or pay child support. On September 4, 2013, both parents were found to be in substantial non-compliance with the permanency plan and they remain so to date.

Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings that Father and Mother failed to substantially comply with the reasonable responsibilities of their permanency plans. We will address Father's and Mother's respective issues regarding this statutory ground in turn.

## A. Father

In particular, Father's responsibilities under the permanency plans included providing a home for the Child free from environmental hazards, safety hazards, unsanitary conditions, domestic violence, drugs, and unlawful activities or individuals; participating in random drug screens, completing an alcohol and drug assessment upon any failed screen, and following all resultant recommendations; participating in domestic violence classes/counseling and following attendant recommendations made by treatment professionals; providing proof of legal, verifiable income for a period of no less than six consecutive months; paying child support as ordered by the court; notifying DCS of any changed circumstances; maintaining contact with DCS; and attending child and family team meetings and court hearings. Father's responsibilities under the plans also included participating in supervised visitation with the Child and maintaining communication with the Child except for the period when Father was not allowed contact with the Child due to an incident of domestic violence.

Father contends that the permanency plans were confusing, incomplete, and failed to clearly set forth his requirements and responsibilities. He argues that he substantially complied with the responsibilities he understood to be his, including parenting classes, stable income, stable housing, and domestic violence counseling. His argument that the plans were confusing is premised upon the assertion that the "Statement[s] of Responsibilities" attached to the third and fourth plans were inconsistent with the requirements set forth in the plans themselves. DCS presented all four permanency plans at trial as part of a collective exhibit. Beginning with the third plan, a "Statement of Responsibilities" is attached as a summary of the "action steps" delineated for each parent as responsibilities in the body of the permanency plan. Upon our careful review, we note that the only requirement missing from the Statement of Responsibilities attached to the third plan, and subsequently the fourth plan, is that Father complete

parenting classes. When Father's counsel confronted Ms. Dyer at trial with the absence of this requirement from the Statement of Responsibilities, she stated that she was sure the requirement was in the permanency plan. She further stated:

> I would expect that, along with the statement of responsibility, that most of the parents would review the plan. And I do know that it was in previous plans and it's been discussed at length that he needed to do that. So it was his understanding that he needed to do that because he signed up for them the first time.

Our review of the plans reveals that Ms. Dyer was correct that the requirement of parenting classes was in the third permanency plan. However, the requirement was not previously set forth as a requirement in the first and second permanency plans. In the introductory section of the second plan, DCS did note that Father's failure to complete parenting classes was one of the remaining obstacles to reunification.

To the extent that testimony revealed parenting classes to be a requirement from the beginning and that the requirement appears to be omitted from the early permanency plans and the statements of responsibilities in the later plans, we agree with Father that this particular requirement proved confusing in the written permanency plans. However, at no time in his testimony or his argument on appeal has Father maintained that he did not understand the completion of parenting classes to be a requirement for his reunification with the Child. Instead, he conceded at trial that he began to take parenting classes soon after the Child's removal into protective custody but failed to complete the full course. Father further testified that although he had begun taking parenting classes again when he returned from Georgia in late 2013, several class sessions remained. He acknowledged that because he had been required to commence a new set of parenting classes after his return, he still had six class sessions to complete. He maintained, however, that only two sessions involved course material to which he had not been exposed previously.

Our review of the record reveals that all of Father's responsibilities other than the completion of parenting classes were clearly and consistently set forth in the permanency plans, as well as the summarized statements of responsibilities attached to the third and fourth plans. Father asserts that in addition to his effort to complete parenting classes, he substantially complied with the requirements of the permanency plans because by the time of trial, he (1) could provide the Child with a stable home at the paternal grandmother's residence, (2) had plans to earn a steady income, and (3) had completed a domestic violence course. We find Father's argument to be unavailing.

Father appeared at the final day of trial in custody, having been incarcerated for approximately six weeks as a sanction for civil contempt due to his failure to pay child support. Father testified that he would be released as soon as he paid $583 in child support to purge his contempt sanction. *See Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000) (explaining that a civil contemnor "can purge the contempt by complying with the court's order"). Father stated that when released, he would return to his prior living situation in his mother's ("Paternal Grandmother's") home, where he had resided since 2009. Father further explained that Paternal Grandmother rented a three-bedroom apartment and that he was obligated on the lease with her. They lived there with his brother and his eleven-year-old cousin.

Ms. Dyer testified that Paternal Grandmother's home was appropriate for the Child, but she also expressed concern that Paternal Grandmother had previously refused to provide a placement for the Child and had questioned whether Father was the Child's biological father. Father agreed that Paternal Grandmother continued to question the Child's paternity. He also acknowledged that Paternal Grandmother had given him funds to have a DNA test administered but that he had failed to use the money for that purpose. Father explained that Paternal Grandmother was not willing to pay the child support purge amount to secure his release from jail because she was "mad" concerning his spending the money she supplied him and not obtaining a DNA test. When questioned regarding where he would reside with the Child if at some point they could no longer reside with Paternal Grandmother, Father stated that he planned to obtain a residence of his own when he could afford it.

As to the requirement that he provide proof of legal, verifiable income for a period of no less than six consecutive months, Father testified during the first day of trial on August 29, 2014, that he had been employed through a temporary staffing service since May 2014. At the time the Child was removed into protective custody, Father was similarly employed through a temporary staffing service. Regarding income, he stated that he earned $1,000 to $1,500 a month when working regularly. He advanced, however, that because of the nature of his temporary employment, he would need assistance from family members to support the Child. Father testified that he had been court-ordered to pay $300 per month in child support prior to June 2014, when the amount increased to $583 per month. He acknowledged that even at the lower rate, he "was so far behind" and had been only paying "what [he] could at the time." During the final day of trial in October 2014, Father testified that due to his incarceration, he was unemployed. He maintained that upon his release from jail, he would be able to return to employment with a temporary staffing agency. He also planned to earn $150 a week "throwing newspapers" for his aunt, and he stated that he had a job lined up at a "chicken house." We note that Father failed to meet the plan requirement of providing proof of verifiable income for a period of no less than six consecutive months.

12

DCS does not dispute that by the time of trial, Father had completed a domestic violence course. As DCS points out, however, Father did not begin to fulfill this requirement until the termination petition had been filed, approximately two and one-half years after the Child had been removed into protective custody and Father had agreed to the requirement in the first permanency plan. The trial court expressed concern in its November 5, 2014 order that the parents had not taken the domestic violence and parenting course requirements more seriously. On the matter, the court specifically stated: "Those aren't pretend. They're not play. They're not come when you want to, go when you want to, you know, this will be a good idea." When Father was questioned regarding why he did not attempt to have his visitation privileges with the Child restored sooner after those privileges were suspended in December 2011, the following exchange ensued:

DCS's Counsel: So domestic violence has never been an issue with you and the mother of this child?

Father: No. I never had – I don't have no history of domestic violence.

DCS's Counsel: Okay. And you don't remember the incident at the visitation?

Father: Yes, I remember the incident. And I explained the incident to you . . . the last time we was here.

DCS's Counsel: That was violence, wasn't it?

Father: Uh?

DCS's Counsel: That was violence, wasn't it?

Father: No, it wasn't violence. I told you. How was it violence when I told you I never even touched her? The only thing I did was grab her phone.

DCS's Counsel: Okay.

Father: There was no violence. I never hit her at all.

13

DCS's Counsel:     So, in your mind, there was never a reason for you to take the domestic violence classes?

Father:           No, because I never had any issues of domestic violence against anybody.

Although Father eventually completed the requirement that he participate in a domestic violence course, his denial of the need for the course and his assertion that domestic violence must involve actual "hitting" demonstrate a troubling lack of the understanding the course was meant to engender. *See* Tenn. Code Ann. § 36-3-601(1) (defining "domestic abuse" in part as placing a domestic abuse victim, "in fear of physical harm" "by other than accidental means").

In addition, Father's disappearance for nearly eighteen months during the three years the Child was in protective custody represented undisputed noncompliance with the permanency plans during that time period. For this extended period of time, Father failed to communicate with DCS or make any effort to reestablish visitation with the Child. We recognize that between Father's reappearance in August 2013 and his incarceration in August 2014, he did make such efforts and that he had resumed visitation with the Child in December 2013. We decline to determine that Father's late actions in this matter constituted substantial compliance with the reasonable responsibilities delineated in the permanency plans. We conclude that the trial court did not err in terminating Father's parental rights based upon clear and convincing evidence of this statutory ground.

B. Mother

In its November 5, 2014 order, the trial court noted that it had previously found Mother to be in substantial compliance with her reasonable responsibilities under the first permanency plan in an Order on Permanency Hearing entered August 2, 2012, approximately one year after the Child's removal into protective custody. The trial court ultimately found, however, that Mother had not substantially complied with the reasonable responsibilities and requirements of the permanency plans in the two years following that August 2012 permanency hearing.

As with Father, Mother's responsibilities and requirements under the permanency plans included providing a home for the Child free from environmental hazards, safety hazards, unsanitary conditions, domestic violence, drugs, and unlawful activities or individuals; participating in random drug screens, completing an alcohol and drug assessment upon any failed screen, and following all resultant recommendations; participating in domestic violence classes/counseling and following attendant recommendations made by treatment professionals; providing proof of legal, verifiable

14

income for a period of no less than six consecutive months; paying child support as ordered by the court; notifying DCS of any changed circumstances; maintaining contact with DCS; and attending child and family team meetings and court hearings. Mother's responsibilities under the plans also included participating in supervised visitation with the Child and maintaining communication with the Child.

Mother asserts that the trial court erred by finding her in substantial noncompliance with the permanency plans because at the time of trial, the only requirements she had not completed were the domestic violence course and payment of her child support arrearage. We disagree with Mother on this issue. We do recognize, as did the trial court, that Mother participated consistently in both supervised and unsupervised visitation with the Child throughout the three years the Child was in protective custody. She resumed unsupervised visitation in December 2013 for four hours each week, and by the time of trial, she was enjoying such visitation in her own home. It was undisputed that Mother regularly attended court hearings and child and family team meetings. However, when Mother's efforts toward compliance with the reasonable responsibilities and requirements of the permanency plans are viewed as a whole, we determine that the evidence does not preponderate against the trial court's findings that she failed to substantially comply.

Mother's argument regarding this issue fails to account for the long lapse of time between the trial court's finding that she was in substantial compliance in August 2012 and Mother's procuring verified employment with a Hardee's restaurant in March 2014. Eventually, she began to pay child support in July 2014 (one month before trial began) and enrolled in an approved domestic violence course only weeks before trial began. In its specific findings as to Mother's lack of substantial compliance during the three years the Child was in protective custody, the trial court in its November 5, 2014 order stated in pertinent part:

> The Court heard from Kelly Dyer, DCS worker, who stated the mother made very little progress on the plan of care until after the termination petition was filed. Mother had no verifiable income from the time the child came into custody until someone from DCS initiated contact with a prospective employer around the time the petition was filed. Mother has had stable housing with a relative for the last year but numerous people live in the home and the mother exercises parenting time with her other children on the weekends.
>
> Due to a prior Domestic Assault charge mother was required to attend domestic assault classes. Mother instead provided documentation showing she attended a two (2) hour session with a local pastor. She has

15

since begun attending those classes. She did complete the six (6) week parenting classes but took a year to do so.[2] Mother has maintained her parenting time and paid child support, although she has a sizeable arrearage.

As the trial court referenced in regard to housing, Mother had resided in a two-bedroom home with her mother ("Maternal Grandmother"), sister, and nieces, ages four and seven, for at least eighteen months by the time of trial. In addition, the Child's half-siblings also visited with Mother in her home. Mother stated that Maternal Grandmother slept on an "emergency bed" in the front room, Mother and her sister shared a bedroom, and her nieces shared the other bedroom. According to Mother, if the Child were to reside with her, the Child would sleep in a third bed in the young girls' bedroom. Mother amended her testimony somewhat as she attempted to account for two of her other children, a son and daughter, sleeping in the home when they stayed overnight.

Ms. Dyer testified that DCS was satisfied that the home itself constituted stable housing for Mother and the Child. She expressed concern, however, that the home was not large enough for everyone living there. She also testified that Mother's current paramour had been seen by DCS personnel at the home several times and that she suspected the paramour was actually residing in the house. When questioned regarding the possibility of securing her own housing, Mother denied that there was any need for a change. Ms. Dyer also testified that Mother had neglected to remove a large amount of broken glass from her yard. Mother disputed that the broken glass was in her yard, insisting that it was actually in a public walkway nearby.

As to employment, Mother testified that she was working twenty-eight hours a week at a Hardee's restaurant by the time of trial. Ms. Dyer acknowledged that according to Mother's supervisor at the restaurant, Mother arrived on time for her shifts and performed the work assigned. However, verification of these five months of employment was the only documentation of employment that Mother had presented to DCS in more than three years while the Child had been in protective custody. At the time of trial, Mother owed a $7,000 arrearage in child support for this Child.

---

[2] Mother also asserts that the trial court inaccurately found that she had not completed parenting classes. To the contrary, as this excerpt from the court's order demonstrates, the court did recognize Mother's completion of parenting classes. Mother cites the court's general statement in the same order that "Both parents had an understanding of the requirements regarding parenting and domestic violence classes but have not made consistent and effective efforts to comply." Considering Mother's inconsistent efforts to complete an approved domestic violence course, we do not find the court's assessment in its order to be in error.

Finally, Ms. Dyer testified that the need for domestic violence education had been of primary concern in developing the permanency plans to ensure the safety of the Child. In its August 2012 Order on Permanency Hearing, the trial court stated the following regarding Mother's compliance to date with this requirement:

> The mother completed a two (2) hour domestic violence class and provided the certificate to the Department on this date. The Department needs to contact the instructor in order to obtain details regarding the class and determine whether it meets the permanency plan requirement.

Concerning the matter, Ms. Dyer explained that when she received Mother's documentation of the two-hour domestic violence course, taught by a local pastor, she informed Mother that it was not a course approved by DCS. Ms. Dyer indicated that she knew nothing about the course until Mother presented the certificate and that DCS never would have approved a course of such short duration for domestic violence education. She also testified that Mother and Father had experienced another domestic violence incident after Mother had completed the two-hour course. Ms. Dyer emphasized that she had asked Mother "numerous times to go for domestic violence counseling" and had provided information regarding approved and recommended classes from the time the Child was removed into protective custody. Mother ultimately began participating in an approved domestic violence course after the termination petition was filed, but she had not completed the course at the time of trial. As with Father, Mother's insistent denial at trial that she needed domestic violence education does not reflect favorably on her attention to this requirement. Considering the totality of the evidence, we determine that the trial court did not err in also terminating Mother's parental rights upon clear and convincing evidence of the statutory ground of failure to substantially comply with the permanency plans.

## VI. Persistence of Conditions Leading to the Child's Removal

The trial court further found clear and convincing evidence, as to both parents, of the statutory ground of persistence of conditions leading to removal of the Child from the parents' home. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (2014) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that,

17

therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

In its final judgment, the trial court stated the following specific findings regarding this statutory ground:

> [The Child] has been removed by order of a court for a period of six (6) months. The conditions which led to the removal still persist or other conditions persist which in all probability would cause [the Child] to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of Respondents. There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to Respondents in the near future. [The Child] was placed in state custody on July 28, 2011 due to allegations that the child's mother, Annaliza [H.], was moving her children from house to house, and she did not [have] stable housing, employment or transportation. The subject child has been in state's custody for close to three years. In July of 2012, the mother was found to be in substantial compliance with the permanency plan but was unable to achieve reunification. The father was found not to be in substantial compliance with the permanency plans and remains so to date. At the last permanency hearing held on September 4, 2013[,] both parents were found to be in substantial non-compliance with the permanency plan. The Department attempted to provide services to the family to prevent removal, but the mother was non-compliant. The Department has provided services to both the mother and the father since the child came into custody and those efforts are on-going.

Upon careful review, we further determine that a preponderance of the evidence supports the trial court's findings as to this statutory ground. We will address Father's and Mother's respective issues regarding this ground in turn.

18

A.  Father

In his argument regarding this statutory ground, Father relies on his previous assertion that the trial court erred by finding clear and convincing evidence that Father had not substantially complied with the reasonable responsibilities set forth in the permanency plans.  He confines his specific argument regarding this issue to the following statement:  "Likewise, the question of non-compliance with the permanency plan cannot be used as a barrier that would create a persistence of conditions preventing the child's reunification with her father."  Having previously determined that the evidence does not preponderate against the trial court's findings regarding Father's lack of substantial compliance with requirements reasonably designed to correct conditions leading to the Child's removal, we are not persuaded by Father's argument.

We do find it necessary, however, to address the threshold consideration of whether the Child was removed from Father's home by court order when she was taken into protective custody.  *See* Tenn. Code Ann. § 36-1-113(g)(3) (providing as a threshold requirement for this statutory ground that "[t]he child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months . . . ."); *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730 at *7 (Tenn. Ct. App. Feb. 27, 2015) (citing *In re Maria S.*, No. E2013-01295-COA-R3-PT, 2013 WL 1304616 at *10 (Tenn. Ct. App. Apr. 1, 2013), as holding, "burden of proof not met where 'the Children were not removed from Father's home' and the father was incarcerated during the pertinent time").  Under the specific circumstances of the case at bar, we determine that the Child was removed by court order from Father's home as well as Mother's home.

Prior to the Child's physical removal from Mother's home, it is undisputed that the Child had been residing during alternating weeks with Father.  During the termination proceeding, DCS presented pertinent orders entered by the trial court during the dependency and neglect proceedings as part of a collective exhibit.  Although the index to this exhibit lists "Protective Custody Order Dated 8-12-11," no such order is included in the record before us.  The first order included in the record is the trial court's Order on Preliminary Hearing, entered September 6, 2011, following a hearing conducted on August 23, 2011.  This order does reference "the Order of Temporary Legal Custody issued by the Hamilton County Juvenile Court on July 27, 2011 for [the Child]" and states that at the time of removal, it "was contrary to the [Child's] welfare to remain in the care, custody or control of the parents . . . ."  The court subsequently found in the Order on Adjudicatory Hearing that Father and Mother, had "recently signed a petition for a consent order to give custody of [the Child] to a relative, in which the parents stated that they were too unstable to care for their child."  We therefore determine that the Child was removed by court order from Father's home as well as Mother's home and that DCS established the threshold consideration for this statutory ground.  *Cf. In re Destaney D.*,

No. E2014-01651-COA-R3-PT, 2015 WL 3876761 at *6 (Tenn. Ct. App. June 23, 2015) ("As in the *In re K.M.K.* decision, we hold that the statutory ground of persistence of conditions is not applicable to Father under the circumstances presented here inasmuch as the record contains <u>no court order removing the Children from Father's home</u>.") (emphasis added) (citing *In re K.M.K.*, 2015 WL 866730 at *7).

The Child was removed from Father's home in particular because Father admittedly could not provide a stable home at the time and had been using marijuana in the recent past. As examined in the previous section of this opinion, Father's ability to provide a stable home for the Child continued to be in question. Father withdrew from all contact with DCS and the court for eighteen months of the three years the Child was in protective custody. At the time of the final hearing, Father had been incarcerated for six weeks due to his inability to purge a civil contempt sanction for failure to pay child support. His only proof of employment was through a temporary staffing company, although he maintained that he would have additional work upon his release from jail. When not incarcerated or residing out of state, Father had resided for several years with Paternal Grandmother and other relatives in an apartment with Paternal Grandmother's and Father's names on the lease. However, Father's testimony that Paternal Grandmother welcomed the Child in the home conflicted with his testimony that Paternal Grandmother was "mad" at him for failing to obtain a paternity test and that she wanted no "drama" with Mother over the Child.

In addition, Father acknowledged that he refused a drug screen requested by DCS in February 2014, stating that he asked a DCS staff person to contact his probation officer for results of recent drug screens. Ms. Dyer testified that she did not pursue the matter after Father's probation officer did not return a phone message. Father apparently made no further effort to assure DCS and the trial court that he had tested negative for controlled substances.

The evidence also demonstrated that continuation of the parent-child relationship would greatly diminish the Child's chances of integration into a safe, stable, and permanent home. We conclude that the trial court properly terminated Father's parental rights based on clear and convincing evidence of this statutory ground.

### B. Mother

As the trial court noted at the close of the termination proceeding, Mother adamantly denied at trial that there existed any basis for DCS to be involved in this matter and denied knowing any reason why DCS would ever have considered her home unsuitable for the Child. On appeal, Mother bases her argument that the trial court erred

by finding clear and convincing evidence of this statutory ground primarily on her assertion that she had obtained and maintained stable housing by the time of trial.

In its April 2012 order adjudicating the Child dependent and neglected, the trial court found that Mother had a "history of unstable and unsuitable housing." The court specifically found that Mother had been "residing with various family members and friends" and that she had been living in residences considered unsuitable by DCS due to "roaches, unsanitary conditions, and safety hazards." As discussed in a previous section of this opinion, Mother's housing situation had stabilized somewhat by the time of trial in that she was residing with Maternal Grandmother and Mother's sister and nieces. However, further testimony demonstrated that the home was small for the number of people living there, that Mother was vague in terms of her plans to make space for the Child, that Mother had only recently begun to earn an income, and that Mother continued to resist removing an environmental hazard.

Regarding the environmental hazard, Ms. Angel testified that when she transported the Child for visitation a few months before trial, she had observed "a lot" of broken glass in the yard of the home, near children's toys and a bicycle. Ms. Angel informed Ms. Dyer of the concern. According to Ms. Dyer, after Mother denied at a previous court hearing that there was broken glass in her yard, Ms. Dyer drove by Mother's house immediately and observed a "15-foot path" of broken glass. The debris appeared to have originated from a broken mirror, lying near children's toys and a bicycle in Mother's yard. During trial, Mother asserted that the glass was not in her yard but on a public walkway and thus that it was not her responsibility to clear the hazard. When questioned regarding this assertion, Ms. Dyer confirmed that the broken glass was definitely inside Mother's yard and, in fact, near a child's bicycle. We emphasize that the trial court's determinations regarding witness credibility are afforded great weight on appeal. *See Jones,* 92 S.W.3d at 838.

Moreover, Mother's refusal to acknowledge responsibility for the duty to clear a safety hazard from the Child's path, even if it were slightly off her property, is indicative of a pattern in her testimony of failing to acknowledge responsibility for the situation giving rise to the Child's removal from her care and continuing to keep the Child in protective custody. When questioned regarding whether she accepted any fault for the Child's removal, Mother answered in the negative and stated: "[T]he people that took my children, they took my children because of money situation and because they are lowdown people and because we just didn't get along." In its remarks articulated at the close of trial, the court noted Mother's "deni[al] that there was any reason for DCS to be involved" and found that Mother had failed to take seriously the process of "working the permanency plan and meeting goals and expectations."

As with Father, the evidence also demonstrated that continuation of the parent-child relationship between Mother and the Child would greatly diminish the Child's chances of integration into a safe, stable, and permanent home. We conclude that the trial court properly terminated Mother's parental rights based on clear and convincing evidence of this statutory ground as well.

## VII. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Arteria H.*, 326 S.W.3d at 175 ("A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest."), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Tennessee Code Annotated § 36-1-113(i) (2014) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

At the conclusion of trial, the trial court considered a recommendation from the guardian *ad litem* that it would be in the Child's best interest to terminate the parental rights of Father and Mother. The court subsequently analyzed the best interest factors, specifying in its final judgment the following findings of fact in relevant part:

Pursuant to T.C.A. § 36-1-113(i), it is for the best interest of the subject child and the public that all of the parental rights of Respondents, [Mother and Father], to the child . . . be forever terminated and that the custody, control and complete guardianship of said child should now be awarded to the State of Tennessee, Department of Children's Services with the right to place said child for adoption and to consent to any adoption *in loco parentis*, in that

Respondents, [Mother and Father], failed to make any adjustment of circumstance, conduct or conditions to make it safe and in the child's best

23

interest to be placed in the care of said Respondents. The continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Respondents, [Mother and Father], failed to make a lasting correction of their circumstances after [DCS] has made reasonable efforts to help them for such duration of time that lasting adjustment does not reasonably appear possible.

There is no meaningful relationship between the Respondents and child.

A change of caretakers and home is likely to have a highly negative effect on the child. The child is placed in a stable home and has adjusted to the current placement. [The Child] has established a strong bond with her foster family . . . .

(Paragraph numbering omitted.) The trial court therefore concluded that it was in the Child's best interest to terminate Father's and Mother's parental rights. Upon careful review, we agree with this conclusion. We will address the best interest analysis regarding each parent in turn.

## A. Father

In support of his contention that the trial court erred by finding that it was in the Child's best interest to terminate his parental rights, Father argues that the court failed to properly weigh the factor of his having made a lasting change in his circumstance such that he could provide a safe and stable home. *See* Tenn. Code Ann. § 36-1-113(i)(1). We disagree. As explained in previous sections of this opinion, we have determined that the evidence does not preponderate against the trial court's finding that Father was not in a position at the time of trial to provide a safe and stable home for the Child. Therefore, we further determine that the evidence does not preponderate against the court's finding that Father failed to make an adjustment of circumstance, conduct, or conditions as to make it safe and in the Child's best interest to be in his home. *See id.*

The trial court's analysis indicates that it also explicitly weighed the following statutory factors against preserving Father's parental rights: (2) failure to effect a lasting adjustment after reasonable efforts by DCS for such a period of time that adjustment does not reasonably appear possible; (4) lack of meaningful relationship between Father and the Child; and (5) negative effect a change of caretakers and physical environment is

likely to have on the Child's emotional, psychological, and medical condition. *See* Tenn. Code Ann. § 36-1-113(i).

Father argues that the trial court erred by not properly weighing what he asserts was DCS's failure to extend reasonable efforts to assist him in effecting a lasting adjustment. *See* Tenn. Code Ann. § 36-1-113(i)(2). He relies on our Supreme Court's statement in *In re Kaliyah S.*, 455 S.W.3d at 556, that "DCS's lack of reasonable efforts may weigh heavily enough to persuade the trial court that termination of the parent's rights is not in the best interest of the subject child." *But see In re Kaliyah S.*, 455 S.W.3d at 556 (explaining that "the extent of DCS's efforts remain a factor to be weighed in the best-interest analysis, not an essential element that must be proven in order to terminate the parental rights of the respondent parent.").

In the instant action, the trial court found at each stage of the proceedings that DCS had extended reasonable efforts to assist the parents. Father asserts that because Ms. Dyer did not know Father's level of education and experience in response to a question at trial and because DCS did not offer another drug screen after Father refused the screen in February 2014, the trial court should have found that DCS failed to extend reasonable efforts to assist Father. In contrast, we note, for example, that DCS maintained contact with Father at all times except when he withdrew from contact; brought Father back into permanency plan development following his extended absence; helped Father to access a second domestic violence counselor when Father had difficulty connecting with the first recommended instructor; arranged supervised visitation with the Child, including accommodation of Father's frequent rescheduling; and conducted a home visit of Paternal Grandmother's home for suitability. The evidence does not preponderate against the trial court's finding that DCS exerted reasonable efforts to assist Father or the court's weighing of this factor against preserving Father's parental rights.

In its argument regarding this issue, DCS particularly emphasizes Father's lack of a meaningful relationship with the Child. *See* Tenn. Code Ann. § 36-1-113(i)(4). The Child at the time of trial was three and one-half years old, and Father had disappeared from her life for eighteen months during the time period she had been in protective custody. Testimony demonstrated that when Father resumed visitation, the Child did not know him and screamed when she was taken to visit him. By the time of trial, Father was visiting with the Child for one to two hours a week. Ms. Dyer testified that the Child no longer screamed when she was taken to visit Father but that she still resisted the visits and often cried when she thought Ms. Dyer had arrived to take her to see Father.

In addition, the remaining factors cannot be said to weigh in favor of preserving Father's parental rights to the Child. Father had resumed supervised visitation as of December 2013, but testimony evinced that he cancelled or rescheduled visits frequently.

*See* Tenn. Code Ann. § 36-1-113(i)(3). Concerning additional statutory factors, Father had been adjudicated neglectful toward the Child (factor 6); he had been incarcerated through a conviction of reckless endangerment and had incurred additional misdemeanor charges during the pendency of the proceedings, as well as having admitted to using marijuana a few weeks prior to the Child's removal into protective custody (factor 7); and he owed a child support arrearage to the extent that he was incarcerated in September 2014 for failing to purge a civil contempt sanction for nonpayment of child support (factor 9). *See* Tenn. Code Ann. § 36-1-113(i). Upon a careful and thorough review of the record, we conclude that there is clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

## B. Mother

In support of her argument that the trial court erred by finding that the best interest factors weighed against maintaining her parental rights, Mother emphasizes her testimony at trial that she was prepared to provide a stable home and that she was bonded to the Child. The trial court's findings indicate that it explicitly weighed the following statutory factors against preserving Mother's parental rights: (1) failure to make adjustment of circumstance, conduct, or conditions as to make it safe and in the Child's best interest to be in Mother's home; (2) failure to effect a lasting adjustment after reasonable efforts by DCS for such a period of time that adjustment does not reasonably appear possible; (4) lack of meaningful relationship between Mother and the Child; and (5) negative effect a change of caretakers and physical environment is likely to have on the Child's emotional, psychological, and medical condition. *See* Tenn. Code Ann. § 36-1-113(i).

As discussed in previous sections of this opinion, we have determined that the evidence does not preponderate against the trial court's finding that Mother was not prepared at the time of trial to provide a safe and stable home for the Child. As to the factor of a meaningful bond between parent and child, the court, in its remarks made at the close of trial, noted Mother's regular visitation with the Child but stated that in the court's perception, "mother's basically been a weekly playmate of this child and has a friend relationship at best." Mother at the time of trial was enjoying four hours per week of unsupervised visitation with the Child in Mother's home. Ms. Angel, the Child's transporter, acknowledged that the Child knew Mother and had a relationship with her.

Mother does not dispute, however, that the Child resided with her only during the first four months of the Child's life, meaning that by the time of trial, the Child was three and one-half years old and had only spent the first few months of her infancy in Mother's care. In contrast, she had been in the foster parents' care for nearly three years. Ms. Dyer testified that the Child "clung" to the foster parents and that when the time came to

visit Mother, the Child had "made it clear on several occasions that she didn't want to go." Ms. Dyer also expressed that the Child's day care had reported some behavioral issues after the Child's visits with Mother. We emphasize again that the trial court's determinations regarding witness credibility are afforded great weight on appeal. *See Jones,* 92 S.W.3d at 838. We determine that although Mother maintained regular weekly unsupervised visitation with the Child at the time of trial, *see* Tenn. Code Ann. § 36-1-113(i)(3), the evidence does not preponderate against the trial court's finding that Mother had failed to maintain a meaningful parent-child relationship, *see* Tenn. Code Ann. § 36-1-113(i)(4).

In addition, the remaining applicable statutory factors also cannot be said to weigh in favor of preserving Mother's parental rights to the Child. Mother had been adjudicated neglectful toward the Child (factor 6); testimony indicated that she had neglected to remove a safety hazard from her home (factor 7); and she owed a child support arrearage of $7,000 for this Child at the time of trial (factor 9). *See* Tenn. Code Ann. § 36-1-113(i). From a thorough examination of the record before us, we conclude that there is clear and convincing evidence that termination of Mother's parental rights was also in the Child's best interest.

## VIII. Conclusion

The decision of the trial court is affirmed in part and reversed in part. We reverse the trial court's findings upon the statutory ground of abandonment through failure to provide a suitable home as to both Father and Mother. We affirm the trial court's judgment in all other respects, including the termination of Father's and Mother's parental rights to the Child. Costs on appeal are assessed equally to the appellants, Allen C. and Annaliza H., and the appellee, the State of Tennessee, Department of Children's Services. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

27